WILL OF MANGAN.

*September 19, 1924—January 13, 1925.*

*Wills: Construction: Determination of residuary legatee: Ascer-
tainment dependent on subsequent facts: Declarations of
testator: Witnesses: Attorney who drew will: Competency:
When relation of attorney and client exists: Gifts causa mor-
tis: Elements: Executors: Compensation for one who is at-
torney for claimant against estate.*

1. The evidence in a proceeding to settle an executor's account
   and to distribute the estate in his hands is *held* to show that a
   charitable organization which provided a home for testatrix,
   an aged woman, had complied with a clause in her will giving
   the residue of her estate to "whoever will take care of me
   during the balance of my natural life," although it appears
   that testatrix voluntarily made regular money contributions
   to the organization.  p. 340.
2. A lawyer, who had previously represented testatrix and who
   had a conversation with her about the disposal of her prop-
   erty and gave her advice concerning the same, is incompetent
   to testify concerning statements made to him by the testatrix
   during such conversations as to gifts of money by a relative.
   p. 342.
3. The application of sec. 4076, Stats., prohibiting an attorney
   from disclosing communications by a client to him and his
   advice given thereon in the course of professional employ-
   ment, does not depend on the charge made for the service or
   the payment thereof by the client, but upon the relation ex-
   isting between the parties.  p. 343.

4. When one calls on an attorney for professional advice as to the disposition of his property and the attorney gives such advice, it will be presumed, unless the contrary clearly appears, that the relation of attorney and client existed, especially where the attorney has previously represented the client. p. 343.

5. A will cannot be so altered by oral statements as to mean something different from the meaning intended when the will was executed. p. 345.

6. A will may provide for the subsequent ascertainment of facts to identify a beneficiary. p. 346.

7. The evidence is also *held* to prove that testatrix delivered certain property to her stepdaughter for safe-keeping merely, and not with the intention of making a gift *causa mortis*. p. 348.

8. To constitute a valid gift *causa mortis* there must be clearly and intelligently manifested an intention to make a present gift to another, and in consummation of this intention a delivery by the donor of the property to or for the use of the intended donee. p. 346.

9. Whether the executor should be removed and another appointed with directions to proceed to recover certain property which the present executor did not make any substantial effort to find will not be considered on appeal from a final judgment in the estate, the matter not having been litigated or decided in the county court. p. 349.

10. An executor who appeared as attorney for one claiming property, constituting a part of the estate of testatrix, as a gift *causa mortis,* is not entitled to attorney's fees out of the estate, such services having been inconsistent with his duties as executor to preserve the estate. p. 349.

APPEAL from an order and a judgment of the county court of Fond du Lac county: A. E. RICHTER, Judge. *Reversed, with directions.*

This is an appeal from an order and judgment of the county court of Fond du Lac county, and from the findings and conclusions of said court, in the matter of the final settlement of the estate of Ellen Mangan, deceased. There were separate appeals by the *Congregation of St. Agnes, Margaret Mangan,* the executor, *Maurice McKenna,* and the heirs at law of Ellen Mangan.

Ellen Mangan died testate at the Henry Boyle Home for the Catholic Aged in the city of Fond du Lac on April 29, 1921, at the age of seventy-nine years. Ellen Mangan had

been twice married. After the death of her first husband she was married to Captain Mangan on November 10, 1876. Captain Mangan died in 1901. He had been married prior to his marriage to Ellen Mangan and had several children by his first marriage. His youngest daughter, *Margaret,* lived with him and Ellen Mangan for about three years prior to his death. Ellen Mangan was a widow at the time she was married to Captain Mangan. She never had any children of her own.

At the death of her husband, Captain Mangan, Ellen was living in the homestead and continued there until June, 1902, *Margaret* living with her in the meantime. Ellen and *Margaret* had some difficulty, and in June, 1902, Ellen purchased another home a short distance away on the same street, and lived in it with her sister until 1915, *Margaret* remaining at the old homestead. Ellen's sister died in 1915, and in 1916 Ellen went to live with her brother, *Thomas Duffy,* at Kaukauna, with the intention of making her home there, but she had difficulty there, and it was only about six weeks when she returned to Fond du Lac. *Margaret* and Ellen never lived together after 1902, although each lived in a house large enough for both.

Ellen Mangan had eight brothers and sisters, but she had little, if anything, to do with any of them except *Thomas Duffy,* for many years before her death. After returning from the home of her brother, Ellen Mangan made application to enter the Henry Boyle Home for the Catholic Aged, but it seems her application was not at first accepted. *Margaret* and her sister, Mrs. Hogan, became interested and secured the assistance of Mrs. Boyle to intercede with the sisters of the Home to secure the admission of Ellen. She was thereupon admitted to the Home. It is apparent that the sisters of the Home hesitated about accepting the application of Ellen Mangan because of her habits and disposition, which might make her presence in the home disagreeable. There does not appear to have been any condition

finally attached to her admission. No arrangements were
made by any one to pay for her keep.

The Home is under the control and charge of the *Con-
gregation of St. Agnes,* a charitable, religious, and educa-
tional corporation without capital stock. It is a sisterhood
of Catholic women, devoting their lives to the purposes of
the corporation without remuneration other than their food
and clothing.

The husband of Mrs. Mangan was a soldier of the Civil
War, and she received a pension as his widow. While in
the Home Mrs. Mangan turned her pension vouchers over
to one of the sisters to be cashed. The vouchers would be
cashed and the money returned to her. She would then give
the sister out of the proceeds a large portion of the money
as a contribution for her support, keeping about $5 a month
for her own personal use. Her first contribution to the
Home amounted to about $18 a month, which was increased
as her pension was increased, to $25 per month. The sis-
ters never made any demands upon her for these contribu-
tions, and they were purely voluntary on her part. The
sisters treated her most kindly and complied with all her re-
quests. She was well pleased with her care and so expressed
herself on different occasions, especially shortly before her
death. The contributions that she made to the sisterhood
were not adequate to pay for her care and support. She was
old, infirm, almost totally blind, and at times, particularly
toward the end of her life, required the attention of a nurse
almost constantly. One of the sisters, who was a trained
nurse, attended to all her requirements in that regard until
shortly before her death, when her condition was such that
it became necessary to have a second nurse, and the doctor
in attendance procured such nurse, who assisted the sisters
in their care of Ellen for the period of eight days before
her death.

Some time before her death Mrs. Mangan became very
ill, and the doctor who was treating her had her sent to the

St. Agnes Hospital, which hospital was also operated by the *Congregation of St. Agnes.* There she was treated for her affliction for some time, and then again returned to the Home. A couple of weeks before Ellen Mangan died she asked her doctor how much his bill was. The doctor did not know and he did not send her any statement, but Ellen said that *Margaret* would get some of Ellen's money and pay the bill. *Margaret* did pay the bill shortly afterwards, and she testified that she paid it out of her own money. *Margaret* also paid the bill of Ellen Mangan at the hospital, amounting to $50.65, on the day that Ellen left the hospital. She also paid the assistant nurse at the Home $28. This bill was paid by *Margaret* after the death of Ellen. When these bills were paid by *Margaret* she knew of the conditions in the will of Ellen Mangan, hereafter referred to, and had known them since 1919.

Ellen Mangan made three wills, all drawn by *Maurice McKenna,* an old and respected lawyer in the city of Fond du Lac. The second will was drawn September 11, 1916, about six weeks after she became an inmate of the Home. In this will she gave the Home a bequest of $100. In none of these wills was *Margaret* mentioned or any provision made for her. In each will Mrs. Mangan made a bequest for, masses, and in the second one gave the residue of her estate to be disposed of to charity after certain specific bequests, which were also for charitable purposes. Mrs. Mangan was a member of the Catholic faith. In her first will, before she had difficulty with her brother *Thomas,* she gave to Fannie Mangan, a stepdaughter, certain pictures and silverware; to John Duffy, a nephew, $200; to Mamie Duffy, a niece, $200; to *Thomas Duffy,* a brother, $100; to *Mabel Kennedy,* now *Mabel England,* $100; a certain sum for masses and to charitable organizations, and the residue was given to *Mr. McKenna,* in trust, for the support of her sister for the remainder of her life, any balance remaining to

be distributed for the benefit of the poor.   One paragraph of the first will was as follows:

"I am not unmindful of either or any of my relatives who are not named in this will, or the claim of either or any of them on or to my bounty, and all such persons are intentionally omitted therefrom."

The will of Ellen Mangan under consideration (1) directs payment of debts and funeral expenses; (2) gives Reverend Collins or his successor $200 for masses; (3) bequeaths to *Mabel England,* niece, $100; and

"Fourth.   All the rest, residue, and remainder of my estate, real, personal, and mixed, I give, devise, and bequeath to whomsoever will take care of me and provide for me during the balance of my natural life.   Said care and provision must be in a kindly, courteous, friendly, and charitable manner and must include all charges for all services necessary for my complete comfort and support.

"Fifth.   I expressly will and direct that my brother, *Thomas Duffy,* or any member of his family, shall in no event receive any sum whatever out of my estate."

*Maurice McKenna* was named as the executor of the will. The will bears date October 16, 1919.   Letters testamentary were issued to *Maurice McKenna* June 9, 1921.   On May 6, 1921, the executor petitioned the court for proof and allowance of the will, which petition was granted and the will allowed.   He then qualified as an executor.   As such executor he made a written inventory, duly verified, of the property belonging to the testatrix at her death.   This inventory contained a pass-book showing a credit to the testatrix in the First National Bank of $1,800; also a pass-book showing a credit in the Commercial National Bank of $2,765; interest on the book account, $27.65; one pair of diamond earrings, $900; one diamond brooch, $500.

The executor paid the specific bequests and made a report to the county court showing a residue under the fourth para-

graph of the will of $5,073.23, which included the items above mentioned, and prayed a settlement of his account and distribution of the residue to the persons entitled thereto. The county court gave a hearing to the parties in interest, where the facts above recited were shown without substantial dispute. Other facts will be stated in the opinion.

The findings and conclusions of the court were as follows:

"1. That Ellen Mangan, deceased, died testate in the city of Fond du Lac, state of Wisconsin, on or about April 29, 1921, and that her last will and testament now is in probate in this court.

"2. That the claimant, *The Congregation of St. Agnes,* is a religious corporation organized under the laws of the state of Wisconsin and that it at all times hereinafter mentioned owned and operated the Henry Boyle Catholic Home for the Aged in the city of Fond du Lac, state of Wisconsin.

"3. That on the trial of this case had before the court the said *Congregation of St. Agnes* waived its claim for the reasonable value of its services rendered to the said testatrix, Ellen Mangan, deceased, and elected to attempt to establish its claim as the residuary legatee under the fourth paragraph of her said last will and testament.

"4. That the claimant, *Margaret Mangan,* is the stepdaughter of Ellen Mangan, deceased.

"5. That the next of kin and heirs at law of Ellen Mangan, deceased, are: *Thomas Duffy,* a brother, of South Kaukauna, Wisconsin; *Edward Duffy,* a brother, of Craigsville, Minnesota; *Edward C. Duffy* of Minneapolis, Minnesota, a son of Frank Duffy, a deceased brother; *James Flood* of Crystal Falls, Michigan, a son of Anna Flood, a deceased sister; *Mrs. Mabel England* of Iron Mountain, Michigan, a daughter of the said Anna Flood, a deceased sister.

"6. That on or about August 1, 1916, the said Ellen Mangan was admitted by the said *Congregation of St. Agnes* to the Boyle Catholic Home for the Aged as an inmate thereof and that she continued as such until the time of her death.

"7. That at all times during her residence at the said Boyle Catholic Home for the Aged, Ellen Mangan, deceased,

received as income from her own investments and by way of a United States government pension as the widow of Michael Mangan, deceased, sufficient sums of money to maintain herself adequately.

"8. That the said Ellen Mangan, deceased, did, during the period of her said residence at the Boyle Catholic Home for the Aged, maintain, care, and provide for herself out of her own money and income; and that such maintenance, care, and provision was not furnished by either *Margaret Mangan* or the *Congregation of St. Agnes*.

"9. That the said last will and testament of Ellen Mangan, deceased, now in probate, was made by the said testatrix while she resided at the Boyle Catholic Home for the Aged; and that the provisions of paragraph four of the said last will and testament were made by the said testatrix in contemplation of her removal from the said Boyle Catholic Home for the Aged to the home of certain of her relatives to whom she intended giving by her last will the residue of her estate upon the conditions mentioned in the said fourth paragraph thereof.

"10. That on or about April 20, 1921, in contemplation of death, Ellen Mangan gave and delivered to *Margaret Mangan* the diamond pin inventoried in the said estate, with the intention of making a gift thereof to the said *Margaret Mangan*.

"11. That at the time of her death the said Ellen Mangan, deceased, was the absolute owner of certain moneys, securities, and other personal property as appears from the inventory filed herein by the executor of her last will and testament, excepting therefrom the diamond pin referred to in the last preceding paragraph.

*"Conclusions of law.*

"1. That the claimant, *The Congregation of St. Agnes,* has failed to establish by proof that it did comply with the conditions of the fourth paragraph of the said last will of Ellen Mangan, deceased, so as to entitle it to take the residue of the said estate as the residuary legatee thereof.

"2. That the petition of the claimant, *The Congregation of St. Agnes,* should be wholly denied.

"3. That the said claimant, *Margaret Mangan,* has failed to establish by proof that she did comply with the conditions

of the fourth paragraph of the said last will of Ellen Mangan, deceased, so as to entitle her to take the residue of the said estate as the residuary legatee thereof.

"4. That the said petition of the claimant, *Margaret Mangan,* should be wholly denied as to the residue under the said last will, but that the inventory filed by the executor should be corrected to conform to the facts by striking therefrom the diamond pin, and that the said diamond pin should be assigned to the said *Margaret Mangan* as the donee thereof *causa mortis.*

"5. That at the time of her death the said Ellen Mangan was the absolute owner of certain moneys, securities, and other personal property, more fully described in the inventory filed herein by the executor, excepting therefrom the diamond pin referred to in the last preceding paragraph as the subject of a gift *causa mortis* to *Margaret Mangan.*

"6. That under the proof submitted to this court no person or persons whosoever have complied with the conditions of the fourth paragraph of the said last will and testament so as to entitle such person or persons to take the residue as the residuary legatee or legatees thereof, and that the bequest contained in the fourth paragraph of the said last will and testament has lapsed.

"7. That the said residue should be distributed and assigned in compliance with the provisions of the statutes of Wisconsin relating to the distribution of intestate personal property to the heirs at law and next of kin of Ellen Mangan, deceased, as follows: To *Thomas Duffy,* a brother, of South Kaukauna, Wisconsin, one fourth of the said residue; to *Edward Duffy,* a brother, of Craigsville, Minnesota, one fourth of the said residue; to *Edward C. Duffy* of Minneapolis, Minnesota, a son of Frank Duffy, a deceased brother, one fourth of the said residue; to *James Flood* of Crystal Falls, Michigan, a son of Anna Flood, a deceased sister, one eighth of the said residue; to *Mrs. Mabel England* of Iron Mountain, Michigan, a daughter of Anna Flood, a deceased sister, one eighth of the said residue."

The appellant *Congregation of St. Agnes* assigns as errors: (1) the finding of the court that the *Congregation* failed to establish a compliance with the fourth paragraph

Will of Mangan, 185 Wis. 328.

of the will; (2) the court erred in receiving and considering the testimony of *Maurice McKenna;* (3) the finding that *Margaret Mangan* was entitled to the diamond pin; (4) in failing to require the executor to recover the value of the $1,000 Liberty bond mentioned in the testimony; (5) in allowing $650 of the supplemental account of the executor for attorney and witness fees on the contest.

*Margaret Mangan,* on her appeal, assigns as errors: (1) the failure of the court to find that Ellen Mangan made a gift of her money in the banks to *Margaret Mangan* on April 21, 1921; (2) the court erred in finding that *Margaret Mangan* failed to establish by competent evidence a full compliance with the fourth paragraph of the will.

The executor, *Maurice McKenna,* on his appeal, assigns as errors: (1) the court erred in assigning any part of the estate of Ellen Mangan to the heirs at law; (2) in failing to find that Ellen Mangan had made a gift to *Margaret Mangan* of the funds in the banks; (3) in failing to assign all the residue of the property to *Margaret Mangan* under the fourth clause of the will.

The heirs, in their appeal, assign as errors: (1) the court erred in finding that the diamond brooch was given by the testatrix to *Margaret Mangan* as a donee *causa mortis;* (2) the court erred in allowing, by its final judgment, the executor's supplementary account.

*T. C. Downs* of Fond du Lac, for the appellant *McKenna,* executor.

For the appellants *Duffy* and others, heirs at law and next of kin, there was a brief by *Minahan, Minahan, Minahan & Duquaine,* and oral argument by *Arthur A. Thiele,* all of Green Bay.

*T. L. Doyle* of Fond du Lac, for the appellant *Congregation of St. Agnes.*

For the appellant *Mangan* there was a brief by *Reilly & O'Brien* of Fond du Lac, and oral argument by *M. K. Reilly.*

The following opinion was filed October 14, 1924:

CROWNHART, J.    The appellant *Congregation of St. Agnes* claims that the court erred in failing to find that it had complied with the fourth paragraph of the will of the testatrix, which reads as follows:

"Fourth. All the rest, residue, and remainder of my estate, real, personal, and mixed, I give, devise, and bequeath to whomsoever will take care of me and provide for me during the balance of my natural life.    Said care and provision must be in a kindly, courteous, friendly, and charitable manner and must include all charges for all services necessary for my complete comfort and support."

The facts upon which the appellant relies are not in substantial dispute.    It is uncontroverted that the testatrix had sought admission into the Henry Boyle Home for the Catholic Aged and had been refused by the sisters in charge; that thereafter *Margaret Mangan* and her sister interceded with Mrs. Boyle, the widow of the donor of the Home, who helped to get Mrs. Mangan in the Home.    Mrs. Boyle and *Margaret* went to the Home and secured the admission of Mrs. Mangan thereto.    There was no condition attached to the admission.    *Margaret* did not agree to pay anything for the support of Mrs. Mangan or in any way bind herself for such support; neither was Mrs. Mangan obligated to pay.    The Home was a charitable institution and Mrs. Mangan was accepted as a charitable inmate.    Mrs. Mangan went to the Home on the 1st of August, 1916, and remained there continuously except for a period from February 28 to June 13, 1919, during which time the Home had to undergo repairs owing to a fire which had occurred there.    At that time she was taken into a "Protestant Home," and it does not appear that any expense was attached thereto.    As soon as the Boyle Home was repaired she returned and remained there until her death, except for a week or so in the March preceding, when she was at the St. Agnes Hospital, also

operated by the *Congregation of St. Agnes.* During the time she was in the Home she contributed $18 a month until May, 1917; then $20 a month until March, 1918, and thereafter $25 a month until her death. The *Congregation* made no demands upon her for payment for board and room or otherwise, but Mrs. Mangan, upon receiving her pension vouchers, delivered them to one of the sisters to be cashed, and upon the return of the money to her she voluntarily contributed the sums mentioned. While she was at the hospital the hospital authorities, according to custom, made the usual charges on the books but made no demand upon Mrs. Mangan for payment and rendered her no bill. However, the stepdaughter, *Margaret Mangan,* asked for the bill and voluntarily paid it. For eight days prior to her death the doctor in charge had a special nurse to assist the sisters in the care of Mrs. Mangan, who required constant attention. The bill therefor, amounting to $28, was voluntarily paid by *Margaret* after the death of Mrs. Mangan; likewise the doctor who attended Mrs. Mangan during her last illness was paid by *Margaret.* It appears that Mrs. Mangan had asked the doctor for a bill and had told him that *Margaret* should have some of Mrs. Mangan's money to pay the bill. The *Congregation* furnished Mrs. Mangan with every reasonable comfort, and the sisters in charge were kindly, courteous, friendly, and charitable to her. When ill she had the special attention of one of the sisters who was a trained nurse. It does not appear that any request that she ever made was denied by the sisters. She expressed herself as being well pleased with her care on several occasions, and particularly shortly before her death. The *Congregation* was and is a charitable corporation, and in its operation of the Henry Boyle Home it received aged Catholic people without regard to their ability to pay. The Home was not operated for profit but as a charitable institution. The sisters who performed the services received no remuneration except their board, lodging, and clothing. It

is a fair inference from the evidence that Mrs. Mangan would have received exactly the same care and attention while in the Home, without making any contribution, as she would have received if she had paid for the services in full. The sisters of the *Congregation* did not know of the conditions in the will, although they did know that she had a will executed after coming to the Home. The services that the *Congregation* rendered Mrs. Mangan were in accordance with the express purpose of the Home and in accordance with the religious and charitable purposes of the *Congregation*. The contributions made by Mrs. Mangan were inadequate to fully recompense the Home for the services rendered. Mrs. Mangan was nearly blind, infirm, and required a good deal of attention. She had a large room, well and comfortably furnished, and also had the liberties of the house. Her laundry was done by the Home without charge. *Margaret,* when she visited Mrs. Mangan, frequently had meals at the Home, for which the sisters would accept no pay. The extra nurse, during testatrix's last illness, boarded at the Home, for which the sisters refused pay. It is not too much to say that to all intents and purposes, after the will was made, the *Congregation* did care and provide for Mrs. Mangan during the period of her natural life in the manner provided in the will, nor is there any question but that she received "kindly, courteous, friendly, and charitable" treatment and that such treatment included all charges for all services necessary for her complete comfort and support, so far as said charges were presented or made known to the sisterhood. Any payments made by others of charges against Mrs. Mangan were purely voluntary; likewise the payments made by Mrs. Mangan to the sisters of the *Congregation* were purely voluntary. No demands were made upon her for payment whatever.

If no other evidence or facts are to be considered than those here mentioned, it would seem to be a necessary de-

duction that the *Congregation* had fully complied with the fourth clause of the will.

However, the claim is made that *Margaret Mangan* complied with such clause in the will and is entitled to the residuary legacy thereunder. Except for the testimony of *Maurice McKenna*, executor of the will and the person who drew the will, it does not appear that *Margaret Mangan* made any contribution to the support of Mrs. Mangan other than the amounts before specified. It appears that *Margaret* knew the conditions in the will, and that during the last ten days of Mrs. Mangan's life she was assiduous in her attentions to Mrs. Mangan; that she did voluntarily pay the hospital bill, the doctor's bill, and the nurse's bill, but otherwise *Margaret* had been away from Fond du Lac and out of the state quite a large portion of the time, and during such times had not given Mrs. Mangan any attention whatever. She had not bound herself to pay for her care and support in the Home, and she did not pay for it. It also appears that Mrs. Mangan had an income, after deducting contributions to the Home, more than sufficient to take care of her personal wants. She spent almost nothing while in the Home for personal effects or for her comfort. There is no evidence to show that she spent any of her income otherwise. Mrs. Mangan had received $65 about April 5th, the month of her death, which was not accounted for in any manner. *Margaret's* claim, therefore, must rest almost entirely on the testimony of *Mr. McKenna* to a conversation that he had with Mrs. Mangan about the 21st of April, 1921, at the Home, wherein he testified that Ellen Mangan stated to him that *Margaret Mangan* had paid her altogether $650 in seven different payments,—six of $100 each, and the last one $50 soon after she came from the hospital. Assuming this evidence to be admissible, the facts related seem altogether improbable. *Mr. McKenna* may have been mistaken in his testimony. The fact is that after Mrs. Mangan's

death *Margaret* assumed control of her personal affairs and took from the room whatever was valuable, and no sum of money is disclosed in the evidence as being found by *Margaret*. Mrs. Mangan had no need of these payments; she was not known to have had any such sums of money about her; and, on the other hand, she had two bank accounts from which she was drawing interest. If any such sums were paid to her it would be very improbable that she would retain them about her person instead of having them banked or given in charge of the sisters. These sums of money purported to have been paid to her were wholly unaccounted for. Not even a suggestion is made as to what use was made of the money. If Mrs. Mangan did make the statement to *Mr. McKenna* it must have been in a period of mental aberration. It was after she had returned from the hospital and only nine days before her death. During this time her doctor testified that she was largely mentally incompetent. Her system was filled with poisons that produced frequent coma and mental stagnation.

However, we do not think the testimony of *Mr. McKenna* was competent. *Mr. McKenna* had been called to the Home by *Margaret,* who claimed that Mrs. Mangan wanted to see him with reference to her will. She said over the telephone to *Mr. McKenna:* "Mrs. Mangan wants you to come down at once and get a taxi and charge it to her." *McKenna* had charge of a copy of the will and other papers relating to Mrs. Mangan's affairs, which he gathered up and took with him to the Home. At the Home he had a conversation with Mrs. Mangan about the disposal of her property, and he gave her advice with reference to the same. He claims that Mrs. Mangan wished to have her will changed, and that he took the matter under consideration over night, but did not report to Mrs. Mangan and made no change in the will. *Mr. McKenna* was an attorney and had represented Mrs. Mangan theretofore as such. He was her attorney in settling the estate of her husband, Captain Mangan. He had

not only drawn the will in question, but had drawn two other wills for her. He drew certain papers for her before she went to live with her brother, which required an attorney to draft, and he then gave her confidential legal advice. He seemed to have been her personal and confidential adviser. This court has recently tried to make plain the duties under the statute of an attorney in relation to his client with reference to communications made by his client to him in the course of his professional business.

The statute reads:

"Section 4076. An attorney or counselor at law shall not be allowed to disclose a communication made by his client to him or his advice given thereon in the course of his professional employment."

The decision in *Will of Cramer*, 183 Wis. 525, 198 N. W. 386, is consistent with the holdings in numerous cases in this state and elsewhere. In *Beilfuss v. Dinnauer*, 174 Wis. 507, 183 N. W. 700, this court said:

"The purpose of the statute [sec. 4076] is to seal the lips of the attorney as to communications made to him in good faith when seeking his professional advice in any and all matters outside of those which are to aid in a criminal intent or to violate the law. To exclude such evidence so forbidden by the public policy of this state is a rule of judicial propriety."

*Mr. McKenna* seemed to be of the opinion that because he made no charge and received no pay for this visit to Mrs. Mangan he did not represent her as an attorney. The test, however, is not the question of a charge or the payment of a bill. The test is the relation existing between the parties. When a person calls upon an attorney for professional advice with reference to the disposition of his property and such attorney gives advice with reference thereto, unless the contrary clearly appears it will be presumed that the relation of attorney and client existed, and especially will the presumption prevail where an attorney is called who has pre-

viously represented the client in a professional way. An attorney should be zealous to uphold the spirit and purpose of the statute and not seek to evade it.

There is another phase of this question involved in the testimony of *Mr. McKenna.* He sought to construe the will by testifying to what Mrs. Mangan told him with reference to her wishes in the matter. *Mr. McKenna* testified that when he arrived at the Home he said:

" 'Mrs. Mangan, what do you want?' She said: 'I want to talk about my will.' I said: 'Where is that will?' She had that will herself and I had a copy. She says to *Margaret:* 'Get my bag,' and *Margaret* started looking for it. She got out of patience and says: '*Margaret,* can't you find that?' She raised up in bed to step out. She said: 'Let me get it.' I said: 'Wait, there is a lot of time. Let *Margaret* look.' *Margaret* found it and brought it. It was in a black satchel and she handed it across. Mrs. Mangan was lying in bed. Mrs. Mangan had the knobs of the satchel tied together with a string. She sat up and unwound them and handed the bag back to *Margaret.* 'Now,' I said, 'where is the will?' *Margaret* opened it and there was the will, and she took it out. She said something had been said by Miss Dillon or somebody whether certain things were down in black and white; if they weren't they were no good. I read the whole will and I read this clause slowly. *Margaret Mangan* was sitting there. I said: 'Now, Mrs. Mangan, that fourth clause, who is that?' She says: 'That's *Margaret Mangan.*' 'Now,' I said, 'Mrs. Mangan, does that mean the sisters at the Home?' She said: 'No, that doesn't mean the Home. I am paying more a month to these sisters than any one here. I don't owe them anything.' *Margaret* took no part in the conversation. I didn't tell *Margaret* not to say anything. After she said the sisters were not to have it she said: 'If there is any doubt about this I want you to write a will right now.' I said: 'Mrs. Mangan, there's no hurry about this. This is something that requires a little thought. I think I ought to have a little time to think about it in. Let us wait until tomorrow morning.' She says: 'I will not live until morning.' I said: 'There's no immediate danger of your death. Let me think this over until tomorrow morn-

ing.' 'No,' she said, 'I want you to sit down and do it now.'
I again pressed her that there was time enough until tomorrow morning. 'No,' she said a second time, 'I will not live
until morning.' Then she was so persistent I thought I will
write that will. I turned to look for stationery and a pen
and ink and paper and there was none there and I didn't
bring any along and I said: *Margaret*, you will have to go
down to the office and get some stationery,' and I requested
again that Mrs. Mangan let me think it over until tomorrow
morning. She said: 'That's all right.' I said: 'I will come
down tomorrow morning or any other time you want me.'
She consented."

After *Mr. McKenna* left on that day he did not return
and did not see Mrs. Mangan again until after her death.
He made no change in the will. There can be no reasonable
doubt that Mrs. Mangan, in calling *Mr. McKenna* to the
Home to advise with him with reference to her will, and
*Mr. McKenna* in giving advice and taking the matter under
consideration, established the relation of attorney and client,
so that *Mr. McKenna's* mouth was sealed under the sacred
obligation of the statute.

The evidence was incompetent on another ground. It is
uniformly held that a will cannot be changed by any oral
expressions of intent by the testator. It may be in some
cases construed by oral testimony of the situation existing at
the time the will was drawn, but under no circumstances
can a will be so altered by oral statements as to mean something different than it meant when it was executed. This
testimony was clearly inadmissible. *Will of Cramer*, 183
Wis. 525, 198 N. W. 386; *Will of Read*, 180 Wis. 497, 193
N. W. 382.

*Mr. McKenna* gave further testimony with reference to
the instructions of Mrs. Mangan to him when he drew the
will in question. This testimony was inadmissible on the
same grounds as the testimony above referred to. *Mr.*
*McKenna* emphatically denied that he was attorney for the
testatrix at that time, but his denial means no more than his

construction of the legal effect of his employment. He said that he was a mere scrivener and not her attorney; that she didn't need an attorney to draw her will. But *Mr. McKenna* was mistaken about this. She did need an attorney and a good one. Even so good an attorney as *Mr. McKenna* was very much puzzled how to draw the fourth clause of the will. The testimony, however, was quite immaterial. It was attempted to show that at that time Mrs. Mangan's mind had not become settled as to the object of her bounty under the fourth clause. No doubt that was true at the time the will was drawn, but the application of the will had to depend on facts subsequently to be ascertained to identify the beneficiary. That was a proper provision in the will. 40 Cyc. 1446, 1447; *Dennis v. Holsapple,* 148 Ind. 297, 47 N. E. 631; 28 Ruling Case Law, 275. Those facts, as we have seen, satisfactorily show that the appellant *Congregation of St. Agnes* fairly and fully complied with the fourth clause of the will, and that the appellant *Margaret Mangan* did not so comply.

There is a further claim on behalf of the appellant *Margaret Mangan* that the diamond brooch, diamond earrings, and the bank accounts were given to her by Ellen Mangan prior to Ellen's death, and that they became and were her property by reason of such gift. We have examined the evidence with care with reference to this phase of the controversy and we find no sufficient evidence that justifies her contention.

To constitute a valid gift *causa mortis* there must be clearly and intelligently manifested an intention to make a present gift to another, and, in consummation of this intention, a delivery by the donor of the property to or for the use of the intended donee. 12 Ruling Case Law, 957; 28 Corp. Jur. 687; *Schultz v. Becker,* 131 Wis. 235, 110 N. W. 214.

There was no pretense that the earrings were delivered. The only contention as to the gift is with reference to the diamond pin and the bank credits. The contention of *Mar-*

*garet Mangan* rests on the testimony of *Mr. McKenna.* He testified that Mrs. Mangan said:

"'*Margaret,* I want to give you these two bank books and satchel.' The bank books described in the inventory, one in the First-Fond du Lac National Bank and the other in the Commercial National Bank, the savings department. *Margaret* took these bank books out. She had her own, another satchel, and she put them in that satchel. Mrs. Mangan said to *Margaret:* 'Where is that diamond pin I gave you yesterday?' *Margaret* says: 'It's here.' She opened that bag and a little leather pocketbook fastened at the top and took out the pin done up in tissue paper. Mrs. Mangan said: 'Keep that diamond pin I gave you yesterday. I was intending if you got all in this case in the end I want you to keep the earrings and give the pin to Dolly. I was intending the earrings should go to Mary Hogan but she's dead. If you get the earrings at the last I want you to keep them and give the pin to Dolly.' "

*Mr. McKenna's* testimony must be interpreted in the light of other circumstances. He testified that Mrs. Mangan followed the foregoing statements by directions to him with reference to drawing another will. In these directions Mrs. Mangan is quoted as saying:

"'Kate Dillon, $50. Now, *Margaret,* I give you these things and will you give Kate Dillon $50.' *Margaret* said: 'I certainly will.' The next was $500 to Fannie Mangan Kennedy, a trunk and her clothes. . . . To Dolly diamond pin, the last item, rest *Margaret Mangan.*' "

*Mr. McKenna* then said:

"It was my instructions to draw that will and come down the next morning. After I took this I started and went out, back to the office."

*Mr. McKenna* did not draw the will as directed. He did not return the next day or at any time thereafter. His only explanation for not drawing the will is as follows:

"The only reason I had was because she had made these gifts I spoke of, and because I was afraid in my own mind if I drew a will that day it would be contested on the grounds

of undue influence and on account of the presence of *Margaret Mangan*. Those were the two reasons that were going through my mind."

It does not appear that Mrs. Mangan ever again referred to the matter, although she lived some eight days thereafter.

The testimony of *Mr. McKenna* is wholly inconsistent with the gift of the pin to *Margaret*. After the pretended gift Mrs. Mangan is said to have instructed *Mr. McKenna* to draw her will and bequeath to Dolly the diamond pin. Further, *Mr. McKenna*, after Mrs. Mangan's death, demanded and secured from *Margaret* all the items of pretended gift, and thereupon listed them in the inventory as a part of the estate, and made oath to the same. More than this, *Mr. McKenna* swore in his petition for final settlement that "he had made careful inquiry and investigation as to any transfers of property made by said deceased in contemplation of death . . . and that no transfer of property was made by said deceased in contemplation of death." There is no other testimony showing that Mrs. Mangan made any gifts. There is no clear and intelligent intention shown that Mrs. Mangan delivered the property in question to *Margaret* with the intention of making a gift *causa mortis*. On the other hand, the testimony is plainly reconciled with the intention of turning the property over to *Margaret* for safe keeping. Under the circumstances we must hold that the property was merely given into the hands of *Margaret* as custodian for Mrs. Mangan and that such property is now a part of the estate. It would appear that Mrs. Mangan's mind was wandering and she was incapable of making a valid gift or a valid will at the time. All these properties became a part of the estate, to be settled under the terms of the will.

It further appears that Mrs. Mangan was the owner of a $1,000 Liberty bond for some time before her death, and that she had it in her possession in her room. The Liberty bond did not come into possession of the executor, and it

does not appear that the executor made any substantial ef-
forts to find the bond. It has been suggested that the pres-
ent executor should be removed and another executor ap-
pointed with directions to proceed to recover the bond or its
value. This matter is not properly before us, and was not
litigated or decided in the court below. It may be considered
by the county court when the cause is remanded for further
proceedings.

The further contention is made that the executor made a
claim for $650 for attorney fees in the contest before the
county judge, and the same was allowed without notice to
other contestants. It is the position of the appellant *Con-
gregation of St. Agnes* that the judgment of the county
court allowing such fees should be reopened and the fees
disallowed. The record discloses that *Mr. McKenna* acted
as attorney for *Margaret Mangan* in this contest. This is
wholly inconsistent with his duties as executor. No allow-
ance for attorney fees for such services, nor for witness fees
in pursuance thereof, can be allowed against the estate. The
executor's duty was to preserve the estate, not waste it.

The appeal of the heirs at law was based on the assump-
tion that no one had qualified under the will to receive the
residuary estate of the testatrix, and hence the heirs were
entitled thereto. The trial court so held. The subject has
been sufficiently discussed in this opinion. Their contention
cannot prevail.

*By the Court.*—The judgment and order of the county
court are reversed, and the cause is remanded to the county
court with directions to render judgment in favor of the
appellant *Congregation of St. Agnes,* awarding thereto the
residuum of the estate, including the money received by the
executor from the banks, the diamond pin, and the diamond
earrings; to consider and allow the final account of the
executor upon due notice to the other parties in interest, ac-
cording to this opinion; and, if sufficient showing is made
to warrant a hearing, to order and conduct a hearing as to

the liability of the party, if any, for the Liberty bond or its proceeds, shown to have been in the possession of Ellen Mangan shortly before her death, and enter judgment according to the facts.

A motion for a rehearing was denied, with $25 costs, on January 13, 1925.